Daniel Cooper (SBN 153576)
daniel@sycamore.law
Jesse C. Swanhuyser (SBN 282186)
jesse@sycamore.law
SYCAMORE LAW, INC.
1004 O'Reilly Avenue, Ste. 100
San Francisco, CA 94129
Tel: (415) 360-2962

Kelly Clark (SBN 312251)
Kelly@lawaterkeeper.org
LOS ANGELES WATERKEEPER
120 Broadway, Suite 105
Santa Monica, CA 90401
Tel: (310) 394-6162
Fax: (310) 394-6178

Attorneys for Plaintiff
LOS ANGELES WATERKEEPER

Ruben Castellón (SBN 154610)
rcastellon@candffirm.com
Anna Le May (SBN 258312)
alemay@candffirm.com
CASTELLON & FUNDERBURK LLP
811 Wilshire Blvd., Suite 1025
Los Angeles, CA 90017
Tel:   (213) 623.7515
Fax:   (213) 532.8984

Attorneys for Defendant
KRAMER METALS, INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES WATERKEEPER, a public benefit non-profit corporation, | Case No. 2:20-cv-10480-CBM |
| Plaintiff, | |
| vs. | **CONSENT DECREE AND ORDER** [22]    [JS-6] |
| KRAMER METALS, INC., a California corporation, | |
| Defendant. | (Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.*) |

**WHEREAS**, Los Angeles Waterkeeper ("LA Waterkeeper" or "Plaintiff") is a 501(c)(3) non-profit public benefit corporation organized under the laws of the State of California, with its main office in Santa Monica, California;

**WHEREAS**, LA Waterkeeper is dedicated to the preservation, protection and defense of the surface, ground, coastal and ocean waters of Los Angeles County from all sources of pollution and degradation;

**WHEREAS**, Kramer Metals, Inc. ("Kramer" or "Defendant") owns and operates a scrap metal facility at 2863 East Slauson Avenue in Huntington Park, California 90255 ("Facility");

**WHEREAS,** storm water discharges associated with industrial activity at the Facility are regulated by the National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001 [State Water Resources Control Board], Water Quality Order No. 2014-57-DWQ as amended on November 6, 2018 ("General Permit" or "Permit"), and the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* ("Clean Water Act" or "CWA"), Sections 301(a) and 402, 33 U.S.C. §§ 1311(a), 1342;

**WHEREAS,** on September 16, 2020, LA Waterkeeper served a notice of intent to sue ("60-Day Notice Letter") on Kramer;

**WHEREAS**, on November 17, 2020, LA Waterkeeper filed a complaint against Kramer in the Central District of California, Civil Case No. 2:20-cv-10480 ("Complaint");

**WHEREAS**, Plaintiff's 60-Day Notice Letter and Complaint alleged violations of the General Permit and CWA for Defendant's alleged discharges of pollutants into storm drains and surface waters, including the Los Angeles River and the Pacific Ocean ("Receiving Waters");

**WHEREAS**, Kramer denies all allegations set forth in the 60-Day Notice Letter and Complaint;

**WHEREAS**, Plaintiff and Defendant (collectively "Settling Parties" or "Parties," individually a "Party"), without either adjudication of Plaintiff's claims or any admission by Defendant of any alleged violation or other wrongdoing, believe it is in their mutual interest to enter into a Consent Decree setting forth terms and conditions appropriate to resolving the allegations set forth in the 60-Day Notice Letter and Complaint without further proceedings;

**WHEREAS**, all actions taken by the Defendant pursuant to this Consent Decree shall be made in compliance with all applicable federal, state and local rules and regulations.

**NOW THEREFORE IT IS HEREBY STIPULATED BETWEEN THE SETTLING PARTIES AND ORDERED AND DECREED BY THE COURT AS FOLLOWS**:

1. The Court has jurisdiction over the subject matter of this action pursuant to Section 505(a)(1)(A) of the CWA, 33 U.S.C. § 1365(a)(1)(A).

2. Venue is appropriate in the Central District Court pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the Facility at which the alleged violations are taking place is located within this District.

3. The Complaint states a claim upon which relief may be granted against Defendant pursuant to Section 505 of the CWA, 33 U.S.C. § 1365.

4. LA Waterkeeper has standing to bring this action.

5. The Court shall retain jurisdiction over this action for purposes of interpreting, modifying or enforcing the terms of this Consent Decree.

## I. OBJECTIVES

6. It is the express purpose of the Settling Parties through this Consent Decree to further the objectives of the Clean Water Act, and to resolve all issues alleged by

LA Waterkeeper in its 60-Day Notice Letter and Complaint. These objectives include compliance with the provisions of this Consent Decree, compliance with all terms and conditions of the General Permit, and compliance with all applicable sections of the Clean Water Act.

7.   In light of these objectives and as set forth fully below, Defendant agrees to comply with the provisions of this Consent Decree, terms and conditions of the General Permit, and all applicable sections of the Clean Water Act at the Facility.

## II.   AGENCY REVIEW AND CONSENT DECREE TERM

### A.   Agency Review of Consent Decree

8.   Agency Review. Plaintiff shall submit this Consent Decree to the United States Department of Justice and the United States Environmental Protection Agency (the "Federal Agencies"), within three (3) business days of the final signature of the Parties, for agency review consistent with 40 C.F.R. § 135.5. The agency review period expires forty-five (45) calendar days after receipt by the Federal Agencies, as evidenced by certified return receipts, copies of which shall be provided to Defendant. In the event that the Federal Agencies object to entry of this Consent Decree, the Parties agree to meet and confer to attempt to resolve the issue(s) raised by the Federal Agencies.

9.   Court Notice. Plaintiff shall notify the Court of the receipt date by the Federal Agencies, as required by 40 C.F.R. § 135.5.

10.   Entry of Consent Decree. Following expiration of the Federal Agencies' 45-day review period, Plaintiff shall submit the Consent Decree to the Court and request entry.

### B.   Effective Date and Term of Consent Decree

11.   Effective Date. The Effective Date of this Consent Decree shall be the date of entry by the Court.

12. <u>Term & Termination</u>. This Consent Decree shall terminate the later of: (i) three (3) years from the Effective Date; (ii) until the conclusion of any proceeding to enforce the Consent Decree initiated prior to three (3) years after the Effective Date; or (iii) until the completion of any payment or other affirmative duty required by this Consent Decree.

## III.    FACILITY DESCRIPTION

13. The Facility is divided into three sub-catchments—Area 1, Area 2, and Area 3 as depicted in Exhibit A. Kramer currently has custody and control of all three areas pursuant to separate rental agreements with the landowner.

14. An employee parking area ("Employee Parking Area"), depicted in red at Exhibit A, is a non-industrial area located immediately east of Area 2 that is used for employee parking.

15. Area 1, depicted in green at Exhibit A, is the main yard where a majority of the Facility's industrial activities take place.

    a.    Storm water associated with industrial activity in Area 1 flows into two depressions—a smaller depression near the Facility's center ("Small Depression"), and a larger depression nearer the north-west corner of the Facility ("Large Depression") (collectively "Depressions"). Storm water falling onto Area 1 is retained in the Depressions during most typical storm events.

    b.    A wide, shallow ditch runs along the eastern edge of Area 1 ("Ditch"). The Ditch's elevation is lower than the rest of Area 1. A portion of storm water associated with industrial activity in Area 1 could potentially drain into the Ditch.

    c.    The Facility's office and building is located in Area 1.

    d.    The Facility's outdoor storage area is located in Area 1, immediately north of the Employee Parking Area.

e.    The scale used to weigh incoming/outgoing trucks is located in Area 1.

16. Area 2, depicted in blue at Exhibit A, is located in the south-west corner of the Facility, and is the entrance/exit to the Facility.

a.    The scale used to weigh incoming/outgoing is located in Area 1.

b.    The scale sits atop a concrete vault ("Vault") from which there is no discharge unless the vault fills and overflows, which has never been observed by Kramer.

c.    There is a slot drain ("Slot Drain") at the far southern end of Area 2 separating it from the sidewalk/street.

17. Area 3, depicted in yellow at Exhibit A, is located in the south-east corner of the Facility and consists of an asphalt lot used for non-industrial purposes and an infiltration basin ("Infiltration Basin").

a.    The Infiltration Basin is approximately 15' wide by 138' long (actual distances will be addressed in the Draft and Final Hydrologic Evaluation Report), and is located along the eastern border of Area 3.

b.    A berm (approx. 7" high) ("7' Berm") (actual measurements will be addressed in the Draft and Final Hydrologic Evaluation Report) runs along the length of the Infiltration Basin, separating it from the asphalt lot.

c.    The Infiltration Basin may receive storm water flowing from the Ditch (in Area 1).

## IV.    COMMITMENTS OF THE PARTIES

### A.    Discharge Prohibition

18. Any unauthorized non-storm water discharge, as defined in the General Permit, from the Facility shall be a violation of this Consent Decree.

19. A storm water discharge from anywhere at the Facility in less the 5-year recurrence interval based on total precipitation by storm ("Control Storm Events") shall be a violation of this Consent Decree, unless such discharge is from a

treatment system meeting the requirements described below in paragraph 24.b. Rainfall amounts for a 24-hour, 48-hour, and 72-hour Control Storm Event shall be determined from an extended database of no less than 10 years from one or more nearby rain gauges by adding all rainfall in inches (greater than 0.1 inch) that fell within twenty-four hours (for the 24-hour standard) or within consecutive days (for the 48-hour and 72-hour standards) to create a record of total storm rainfall amounts and then calculating the average 5-year recurrence interval for 24-hour, 48-hour, and 72-hour rainfall durations.

**B.    Hydrologic/Hydraulic Assessments and BMP Implementation**

20.  Within forty-five (45) calendar days of the Effective Date, Kramer shall submit a technical report ("Draft Hydrologic Evaluation Report") to LA Waterkeeper for review and comment. The Draft Hydrologic Evaluation Report shall include the methods used, data collected (as appendices), summary of data results and their interpretation, and conclusions regarding whether the Facility, as currently configured, will prevent a discharge of storm water associated with industrial activity up to and including each of the Control Storm Events. The Draft Hydrologic Evaluation Report shall be prepared by a professional engineer and must specifically include and/or address each of the following:

a.    Calculate the runoff produced by each Control Storm Event for Area 1 and Area 2 using hydrologic modeling.

b.    For Area 1:

i.    Determine the grade break delineating where runoff flows toward the Ditch, including quantifying the difference in elevation between the beds and rims of the Depressions and the grade break. The delineation can be made using a laser level or technology with equal or better accuracy. Data collection and analysis must be completed by an

engineer with professional training and/or professional experience using the technology selected.

    ii.   Determine the grade break delineating where runoff flows toward the scale and driveway, including quantifying the difference in elevation between the beds and rims of the Depressions and the grade break.

    iii.  Use a method provided for in the Los Angeles County Geotechnical and Materials Engineering Division Policy GS 200.1[1] ("GS 200.1") to conduct a minimum of three tests to measure the infiltration rate in the Large Depression.

    iv.  Use GS 200.1 methods to conduct a minimum of two tests to measure the infiltration rate in the Small Depression.

    v.   Use GS 200.1 methods to conduct a minimum of two, evenly spaced tests in the Ditch.

    vi.  Use the results of the hydrological modeling data (para. 20.a), grade break data (para. 20.b.i-ii) and infiltration test data (para. 20.b.iii-v) to calculate the quantities of flow into the Depressions versus flow into the Ditch and into Area 2, if any, for each Control Storm Event.

    vii.  Determine the rate at which water in the Depressions and the Ditch dissipate through infiltration and evaporation.

    viii. Use the results of paragraph 20.b.vi-vii to assess the quantity of flow to the end of the Ditch and into Infiltration Basin at Area 3, if any, for each Control Storm Event.

  c.   For Area 2:

    i.   Measure the slot drain infiltration rate by filling it with water and timing the level fall. Repeat the measurement at least five times, and

---

[1] Design Infiltration Rate = Measured Percolation Rate/RF, where RF is a designated reduction (safety) factor depending on test method and conditions.

use the average result in further analyses. In the event that onsite water supply is insufficient to accomplish this test, the slot drain infiltration rate may be determined by isolating a representative portion of the trench and conducting the same analysis.

    ii.    Use the results of paragraphs 20.c.i to calculate infiltration in the slot drain versus overflow to the street, if any, for each Control Storm Event.

    d.    For Area 3:

    i.    Use GS 200.1 methods to conduct at least four, evenly spaced tests to measure the infiltration rate of the Infiltration Basin.

    ii.    Use the results of the hydrologic modeling data (para. 20.a), grade break data (para. 20.a.i-ii) and infiltration test data (para. 20.a.iii-v and 20.d.ii) to assess infiltration into the Infiltration Basin substrate versus overflow to the street, if any, for each Control Storm Event.

21. Within thirty (30) calendar days of receiving the Draft Hydrologic Evaluation Report, LA Waterkeeper may provide Kramer with a written set of responses ("Recommendations") to ensure the Draft Hydrologic Evaluation Report adequately assesses, and reaches reasonable conclusions regarding, each of the items described in paragraph 20.a, 20.b, 20.c, and 20.d, including specifically whether the Facility, as currently configured, will prevent a discharge of storm water associated with industrial activity up to and including each Control Storm Event.

22. Kramer shall incorporate LA Waterkeeper's Recommendations into the Draft Hydrologic Evaluation Report or, alternatively, provide a separate written rationale explaining why any of the Recommendations were not accepted and/or incorporated. In either event, Kramer shall provide a Final Hydrologic Evaluation Report to LA Waterkeeper within thirty (30) calendar days of receipt of any Recommendations.

23. In the event of any dispute regarding Kramer's incorporation of and/or responses to LA Waterkeeper's Recommendations, either Party may invoke the Dispute Resolution procedures set out in Section V of this Consent Decree.

24. In the event that the Final Hydrologic Evaluation Report concludes that storm water may be discharged from the Facility in less than each of the Control Storm Events, Kramer shall, within forty-five (45) calendar days of submitting the Final Hydrologic Evaluation Report, prepare and submit to LA Waterkeeper one of two alternative plans:

a. A plan detailing a set of physical modifications at the Facility ("Draft Facility Modification Plan")—including but not limited to berm(s), drain(s), and/or system for pumping, storing and properly disposing of storm water—that collectively prevent storm water discharges from the Facility up to each of the Control Storm Events; or

b. A plan detailing the installation of a treatment system ("Draft Treatment System Plan") capable of ensuring compliance with the numeric limitations set out in Table 1 below. The treatment system will treat storm water runoff generated by an 85th percentile, 24-hour storm event (as defined in the General Permit Section X.H.6). Such treatment system shall include polymer-assisted coagulation, followed by settling and filtration. Kramer may alternatively use a technology of equivalent effectiveness demonstrated by independent, i.e., not the manufacturer's, data.

25. LA Waterkeeper shall have twenty-one (21) calendar days to provide Kramer with written responses to either a Draft Facility Modification Plan or a Draft Treatment System Plan ("Response") regarding the adequacy of either plan to, respectively, achieve zero discharge up to and including each Control Storm Event, or treat Facility storm water discharge sufficiently to consistently achieve compliance with applicable Numeric Effluent Limitations.

26. Kramer shall incorporate LA Waterkeeper's Reponses into either the Draft Facility Modification Plan or a Draft Treatment System Plan or, alternatively, provide a separate written rationale explaining why any of the Reponses where not accepted and/or not incorporated. In either event, Kramer shall provide a Final Facility Modification Plan or a Final Treatment System Plan to LA Waterkeeper within thirty (30) calendar days of receipt of any Responses.

27. In the event of any dispute regarding Kramer's incorporation of and/or responses to LA Waterkeeper's Responses, either Party may invoke the Dispute Resolution procedures set out in Section V of this Consent Decree.

**C.    Prohibition on Use of Non-Industrial Areas**

28. The Employee Parking Area shall be used exclusively for employee parking. Any use of the Parking Lot for industrial activity is prohibited and shall be a violation of this Consent Decree.

29. Area 3 shall be used exclusively by Kramer for non-industrial purposes. Any use of Area 3 for industrial activity by Kramer or with Kramer's consent shall be a violation of this Consent Decree.

30.   For purposes of this Consent Decree, industrial activity shall include, but is not limited to: (i) activities categorized under SIC code 5093, including the use, sorting, management, storage (for any length of time) of scrap metal materials; (ii) activities categorized under SIC codes 4212 and 4231, including the fueling, maintenance, repair, cleaning, painting, and lubricating of any vehicle, hauling equipment and roll-off container; and (iii) storage of equipment associated with industrial activity at the Facility, including trucks, bins, and roll-off containers.

**D.    Storm Water Pollution Prevention Plan**

31. SWPPP Revision. Kramer shall revise its SWPPP within thirty (30) calendar days of submitting the Final Hydrologic Evaluation Report in the event that such report concludes the Facility, as currently designed, will prevent storm water

discharges from each Control Storm Event. If not, then Kramer shall revise its SWPPP within thirty (30) calendar days of submitting the Final Facility Modification Plan or Final Treatment System Plan, depending on which plan, if either, is prepared.

32. The Revised SWPPP shall:

a. document and describe industrial activities occurring at the Facility's Area 1 and Area 2;

b. document and incorporate the analyses and conclusions of the Final Hydrologic Evaluation Report;

c. document and incorporate the analyses and conclusions, if applicable, of the Final Facility Modification Plan or Final Treatment System Plan, including any technical drawings/plans for any Facility modifications, including the installation of a treatment system if applicable;

d. contain a revised pollutant source assessment, including all elements required by Section X.G of the General Permit as well as assessments of the potential for the Facility's storm water discharges to contain pollutants for which the Receiving Waters are 303(d) listed and/or have Total Maximum Daily Loads;

e. describe all BMPs in accordance with Section X.H.4 of the General Permit; and

f. contain a Monitoring Implementation Plan as required by Sections XI and X.I of the General Permit.

33. SWPPP Review. Plaintiff shall have thirty (30) calendar days from receipt of the revised SWPPP described in paragraph 32 to propose any modifications or additions. Defendant shall incorporate Plaintiff's modifications or additions to the revised SWPPP within thirty (30) calendar days of notification of proposed changes, or justify in writing why any changes are not incorporated.

34. In the event of any dispute regarding Kramer's incorporation of and/or responses to LA Waterkeeper's proposed modifications or additions to the SWPPP, either Party may invoke the Dispute Resolution procedures set out in Section V of this Consent Decree.

**E.  Storm Water Pollution Control Measures**

35. Kramer shall, at the beginning or end of each workday, manually sweep the area between the Slot Drain and the far eastern edge of the Facility. Kramer shall collect and properly dispose of all debris resulting from such sweeping.

36. Kramer shall complete all visual observations required by Section XI.A of the General Permit, as well as written records of all such observations.

37. Kramer shall conduct weekly inspections between October 1 and April 30 during the term of this Consent Decree, as well as prior to a forecasted rain event of 50% or greater probability of 0.1 inches or greater, and maintain a log of conditions and corrective action, if any, at the following areas:

a.      the Ditch;

b.      the Infiltration Basin; and

c.      Area 2, including the Slot Drain.

38. Kramer shall complete a written Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation"). Such written Annual Evaluation shall be submitted to LA Waterkeeper on July 15 of each year this Consent Decree is in effect.

**F.  Employee Training**

39. <u>Training Program</u>. Within fifteen (15) calendar days of submitting its revised SWPPP, Kramer shall review and revise its employee training program to ensure compliance with the requirements of this Consent Decree and the General Permit, including any training materials, as necessary, for implementation of the

training program ("Training Program"). Such Training Program shall be detailed in the SWPPP.

40. The Training Program shall provide: (a) that there be a sufficient number of employees delegated to achieve compliance with this Consent Decree and the General Permit; and (b) that these employees are properly trained to perform the required compliance activities under this Consent Decree and the General Permit.

41. The Training Program shall, at a minimum, include the following:

a. <u>Non-Storm Water Discharge Training.</u> Defendant shall train all non-clerical employees in the General Permit's prohibition of non-storm water discharges so that employees know what non-storm water discharges are, how to detect them, how to prevent them, and procedures for reporting non-compliance.

b. <u>Treatment System Training.</u> Defendant shall, as appropriate, train all non-clerical employees in the proper operation, management, and maintenance of any treatment system installed at the Facility.

c. <u>Employee Designation.</u> Defendant shall designate (by position/title) employees for specific SWPPP implementation responsibilities.

d. <u>Monitoring Training.</u> Defendant shall, as appropriate, train all individuals managing the Facility's treatment system(s) and/or collecting any samples at the Facility pursuant to this Consent Decree or the General Permit on the technical protocols, including any chain of custody requirements, to ensure storm water samples are properly collected, stored, and submitted to a certified laboratory.

e. <u>Visual Observation Training.</u> Defendant shall provide training to all individuals performing visual observations at the Facility pursuant to this Consent Decree and the General Permit.

42. <u>Language.</u> The training and training materials shall be available and offered in the language(s) in which relevant employees are fluent. If necessary, Defendant shall provide a translator or translators at all trainings where such translation is likely

to improve staff comprehension of the Training Program and improve compliance with this Consent Decree and the General Permit.

43. All staff trainings shall be provided by a Qualified Industrial Storm Water Practitioner (as defined in Section IX.A of the 2015 Permit) familiar with the requirements of this Consent Decree and the General Permit, and shall be repeated as necessary to ensure that employees are familiar with the requirements of this Consent Decree, the General Permit, and the Facility's SWPPP.

44. The Defendant shall maintain training records to document compliance with paragraphs 39 through 41, and shall provide LA Waterkeeper with a copy of these records within fourteen (14) calendar days of receipt of a written request.

### G.     Data Collection and Reporting

45. In the event that there is storm water discharge(s), Kramer shall collect and analyze two (2) storm water samples from Qualifying Storm Events ("QSE") between July and December, and two (2) storm water samples from QSEs between January and June during the term of this Consent Decree.

46. Should Kramer collect storm water samples, Kramer shall collect from all industrial points of discharge, that may include:

a.     Discharge Point 1 (entrance/exit to Facility at Area 2, should there be any overflow from or bypass of the slot drain);

b.     Discharge Point 2 (should there be a discharge of storm water associated with Kramer's industrial activity from the Infiltration Basin); and

c.     Discharge Point 3 (from any treatment system in the event that one is installed at the Facility).

47. All storm water samples shall be analyzed for parameters listed in Table 1. Exceedances of the Numeric Limits in Table 1 shall constitute violations of this Consent Decree unless the storm water sample is collected from a discharge from a

treatment system during a storm event exceeding the 85th percentile, 24-hour storm event, as described in paragraph 24(b).

TABLE 1

| Parameter | Numeric Limit | Source |
|---|---|---|
| pH | 6.5 – 8.5 SU | Basin Plan |
| Oil & Grease | 15 mg/L | EPA Benchmark |
| Total Suspended Solids | 100 mg/L | EPA Benchmark |
| Iron | 1.0 mg/L | EPA Benchmark |
| Aluminum | 0.75 mg/L | EPA Benchmark |
| Cadmium (Total) | 0.0031 mg/L | TMDL/NEL |
| Copper (Total) | 0.06749 mg/L | TMDL/NEL |
| Lead (Total) | 0.094 mg/L | TMDL/NEL |
| Zinc (Total) | 0.159 mg/L | TMDL/NEL |
| Chemical Oxygen Demand | 120 mg/L | EPA Benchmark |

48. Kramer shall provide LA Waterkeeper with all storm water sampling data collected from each of the Discharge Points sampled within fourteen (14) calendar days of its receipt from the laboratory during the term of this Consent Decree.

49. Kramer shall, in addition to parameters identified in Table 1, analyze all storm water samples for additional pollutants, if any, identified in the pollutant source assessment conducted as part of its SWPPP revisions made pursuant to paragraph 32.d above.

H. **Compliance Monitoring and Reporting**

50. Annual Site Inspections. LA Waterkeeper may conduct one annual site inspection for the purpose of ensuring compliance with this Consent Decree and the General Permit during the term of this Consent Decree.

51. Dispute-Specific Site Inspections. In the event of a dispute regarding Defendant's compliance with this Consent Decree, and provided a site inspection would be relevant to resolving the Parties' dispute, LA Waterkeeper may conduct additional site inspections during the term of the Consent Decree. Plaintiff shall not

1    unreasonably request, and Defendant shall not unreasonably deny, additional site
2    inspections.

3       52. <u>Site Inspection Notice</u>. Any site inspection shall occur Monday through
4    Friday between 9:00 a.m. and 4:00 p.m. LA Waterkeeper will provide Defendant with
5    no less than seventy-two (72) hours notice prior to an inspection. Notice will be
6    provided by telephone and electronic mail to the individual(s) designated below at
7    paragraph 77.

8       53. <u>Inspection Details</u>. LA Waterkeeper shall limit inspection participants to
9    three individuals, all of whom agree to execute the attached Release and Waiver
10   (Exhibit B) prior to entering the Facility. LA Waterkeeper's representative shall be
11   permitted to take photographs or video recording, as well as collect storm water
12   samples at the designated discharge points as identified in the then-current SWPPP,
13   during any site inspection. Pursuant to the Protective Order entered in this case dated
14   April 1, 2021 (<u>Dkt. 13</u>), Plaintiff shall initially treat the photographs or videos as
15   Protected Material and provide copies of photographs or video to Kramer within seven
16   (7) calendar days. Kramer shall designate any photos/videos that qualify as
17   CONFIDENTIAL within seven (7) calendar days of its receipt, after which point only
18   information and items designated CONFIDENTIAL will be treated as Protected
19   Material.

20      54. <u>Document Provision</u>. During the term of this Consent Decree, Defendant
21   shall:

22      a.      copy Plaintiff on all documents and written communications submitted to
23              the Regional Water Quality Control Board, Region IV, the State Water
24              Resources Control Board, and/or any Federal, State, local agency, county,
25              or municipality that are related to compliance with the General Permit
26              and/or this Consent Decree; and

b.    provide Plaintiff with all documents and written communications related to compliance with the General Permit and/or this Consent Decree that are received by Defendant from any Federal, State, local agency, county, or municipality within fourteen (14) calendar days of receipt by Defendant.

55. <u>Compliance Monitoring</u>. Defendant agrees to partially defray costs associated with Plaintiff's monitoring of Defendant's compliance with this Consent Decree by paying five thousand dollars ($5,000.00) for each year during the term of the Consent Decree. Payments shall be made on or before July 1, 2021, July 1, 2022, and July 1, 2023 to the Sycamore Law Attorney Client Trust Account, 1004 O'Reilly Avenue, San Francisco, California, 94129.

**I.    Environmental Mitigation, Litigation Fees and Costs, Stipulated Penalties, and Interest**

56. <u>Environmental Mitigation Project</u>. Defendant agrees to make a total payment of thirty-six thousand dollars ($36,000.00) the Rose Foundation. Defendant agrees to pay $12,000 on or before July 1, 2021, July 1, 2022, and July 1, 2023.

57. Environmental Mitigation Project funds will be used to support environmental projects related to water quality in the Southern California Bight, and designed to analyze, reduce, prevent, and/or otherwise mitigate the ecological or public health effects of industrial stormwater and/or non-stormwater discharges. The payments shall be mailed via certified mail or overnight delivery to: Rose Foundation, ATTN: LA Waterkeeper v. Kramer Metals Receiver, 201 4th Street, Ste. 102, Oakland, California 94607.

58. <u>Plaintiff's Fees and Costs</u>. Defendant agrees to pay a total of seventy-five thousand dollars ($75,000) to reimburse LA Waterkeeper for costs, including expert/consultant fees and costs, and partially reimburse LA Waterkeeper for reasonable attorneys' fees incurred as a result of investigating and filing the lawsuit, completing disclosures, conducting initial discovery, and negotiating a resolution of

this matter. The $75,000 shall be made in two payments. The first payment of $37,500 shall be made within seven (7) calendar days of the Effective Date. The second payment of $37,500 shall be made within six (6) months of the Effective Date. Payments shall be delivered by certified mail or overnight delivery made payable to: Sycamore Law Attorney Client Trust Account, 1004 O'Reilly Ave, San Francisco, California, 94129.

## V. DISPUTE RESOLUTION

59. This Court shall retain jurisdiction over this matter for the term of this Consent Decree for the purposes of enforcing its terms and conditions, and adjudicating any and all disputes among the Parties that may arise relating to any provision of this Consent Decree. The Court shall have the power to enforce this Consent Decree with all available legal and equitable remedies, including contempt.

60. <u>Meet and Confer</u>. Either party to this Consent Decree may invoke the dispute resolution procedures of this Section V by notifying the other party in writing of the matter(s) in dispute and of the disputing party's proposal for resolution. The Parties shall then meet and confer in good faith (either telephonically or in person) within fourteen (14) calendar days of the date of the notice in an attempt to fully resolve the dispute.

61. <u>Motion</u>. In the event that the Parties cannot fully resolve the dispute within thirty (30) calendar days of the meet and confer described in paragraph 60, the Parties agree that the dispute may be submitted for formal resolution by filing a motion before the United States District Court for the Central District of California. The Parties agree to request an expedited hearing schedule on the motion.

62. In resolving any dispute arising from this Consent Decree before the Court, the Parties shall be entitled to fees and costs incurred pursuant to the provisions set forth in Section 505(d) of the Clean Water Act, <u>33 U.S.C.§ 1365(d)</u>, applicable case

law interpreting such provisions, or as otherwise provided for by statute and/or case law.

## VI.     RELEASE OF LIABILITY AND COVENANT NOT TO SUE

63. <u>Plaintiff's Waiver and Release of Defendant</u>. In consideration of the above, upon the Effective Date, Plaintiff, on its own behalf and on behalf of its officers and directors, release Defendant, its officers, directors, managers, employees, members, parents, subsidiaries, divisions, affiliates, insurers, landlords, lenders, successors or assigns, agents, attorneys and other representatives, from and waives all claims that were or could have been raised based on the 60-Day Notice Letter and/or Complaint up to and including the Termination Date of this Consent Decree.

64. Nothing in this Consent Decree limits or otherwise affects either Party's rights to address or take any position that a Party deems necessary or appropriate in any informal or formal proceeding before the State Water Board, Regional Water Board, California EPA, U.S. EPA, or any other judicial or administrative body on any matter relating to Defendant's compliance at the Facility with the General Permit or the Clean Water Act.

## VI.     MISCELLANEOUS PROVISIONS

65. <u>No Admission of Liability</u>. The Parties enter into this Consent Decree for the purpose of avoiding prolonged and costly litigation on disputed claims. Neither the Consent Decree nor any payment pursuant to the Consent Decree shall constitute or be construed as a finding, adjudication, or acknowledgement of any fact, law or liability, nor shall it be construed as an admission of violation of any law, rule, or regulation. The Defendant maintains and reserves all defenses it may have to any alleged violations that may be raised in the future.

66. <u>Counterparts</u>.  This Consent Decree may be executed in any number of counterparts, all of which together shall constitute one original document.  Telecopy,

electronic mail, and/or facsimile copies of an original signature shall be deemed to be originally executed counterparts of this Consent Decree.

67. <u>Authority</u>.  The undersigned representatives for Plaintiff and Defendant each certify that they are fully authorized by the Party whom they represent to enter into this Consent Decree. A Party's signature to this Consent Decree transmitted by facsimile or electronic mail shall be deemed binding.

68. <u>Construction</u>.  The language in all parts of this Consent Decree shall be construed according to its plain and ordinary meaning, except as to those terms defined in the Permit, the Clean Water Act, or specifically herein. The captions and paragraph headings used in this Consent Decree are for reference only and shall not affect the construction of this Consent Decree.

69. <u>Full Settlement</u>.  This Consent Decree constitutes a full and final settlement of this matter.

70. <u>Integration Clause</u>.  This is an integrated Consent Decree. This Consent Decree is intended to be a full and complete statement of the terms of the agreement between the Parties and expressly supersedes any and all prior oral or written agreements, covenants, representations, and warranties (express or implied) concerning the subject matter of this Consent Decree.

71. <u>Severability</u>.  In the event that any provision, paragraph, section, or sentence of this Consent Decree is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

72. <u>Choice of Law</u>.  The laws of the United States shall govern this Consent Decree.

73. <u>Negotiated Settlement</u>. The Settling Parties have negotiated this Consent Decree, and agree that it shall not be construed against the Party preparing it, but shall be construed as if the Settling Parties jointly prepared this Consent Decree. Any uncertainty and ambiguity shall not be interpreted against any one Party.

74. <u>Modification of the Consent Decree</u>. This Consent Decree, and any provisions herein, may not be changed, waived, discharged, or terminated unless by a written instrument, signed by the Parties. In the event that there is a dispute regarding a change, waiver, discharge, or termination of any provision(s), either Party may seek resolution from the court.

75. <u>Assignment</u>. Subject only to the express restrictions contained in this Consent Decree, all of the rights, duties and obligations contained in this Consent Decree shall inure to the benefit of and be binding upon the Settling Parties, and their successors and assigns. Defendant shall notify Plaintiff within ten (10) calendar days of any assignment.

76. <u>Force Majeure</u>. Either Parties' performance of any requirement of this Consent Decree shall be extended or modified in the case of a force majeure event as follows:

a. A "force majeure event" is any event arising from causes beyond either Party's control that prevents or delays the performance of any requirement of this Consent Decree despite its best efforts to fulfill the requirement.

b. The requirement to exercise "best efforts to fulfill the requirement" includes using good faith efforts to anticipate any potential force majeure event and good faith efforts to address the effects of any such event (a) as it is occurring and (b) after it has occurred, to prevent or minimize any delay to the greatest extent possible.

c. A force majeure event includes government orders or restrictions related to COVID-19 and comparable public health threats. Any Party seeking to rely upon this paragraph to excuse or postpone performance shall have the burden of establishing that it could not reasonably have been expected to avoid the force majeure event, and which by exercise of due diligence has been unable to overcome the failure to perform.

d. A force majeure event does not include normal inclement weather, a financial inability to perform, or employee negligence.

e. If Kramer seeks to avoid performance of any requirement of this Consent Decree on account of a force majeure event, it shall provide written notice to Plaintiff no later than ten (10) calendar days after the time that Kramer first knew of, or by the exercise of due diligence, should have known of, a force majeure event. The notice shall state the anticipated duration of any delay, its cause(s), and propose an alternative schedule for performing the affected requirement(s).

f. If Plaintiff agrees that a force majeure event has occurred, Plaintiff shall agree to extend the time for Kramer to perform the affected requirement(s) for the time necessary to complete those obligations.

g. If Plaintiff does not agree that a force majeure event has occurred or does not agree to the extension of time sought by Kramer, it may invoke the Dispute Resolution Procedures in Section V of this Consent Decree.

77. <u>Correspondence</u>. All notices required herein or any other correspondence pertaining to this Consent Decree shall be, the extent feasible, sent via electronic mail transmission to the e-mail address listed below, or if electronic mail is not feasible, then by certified U.S. mail with return receipt, overnight delivery, or by hand delivery to the following addresses:

| | |
|---|---|
| If to Plaintiff: | If to Defendant: |
| Jesse C. Swanhuyser<br>Sycamore Law, Inc.<br>414 Olive Street<br>Santa Barbara, CA 93101<br>jesse@sycamore.law<br>(805) 689-1469 | Ruben Castellón<br>Castellón & Funderburk LLP<br>811 Wilshire Blvd. Ste. 1050<br>Los Angeles, CA 90017-2649<br>rcastellon@candffirm.com<br>(213) 623-7515 |
| With copies to: | With copies to: |
| Kelly Clark, Staff Attorney<br>Los Angeles Waterkeeper<br>120 Broadway, Suite 105<br>Santa Monica, CA 90401<br>kelly@lawaterkeeper.org<br>(310) 394-6103 | Douglas Kramer<br>Lewis Kramer<br>Kramer Metals, Inc.<br>2863 East Slauson Avenue<br>Huntington Park, California 90255<br>doug@kramermetals.com<br>lewis@kramermetals.com<br>(323) 587-2277 |

Notifications of communications shall be deemed received three (3) calendar days after the date that they are postmarked and sent by first-class mail, or upon proof of delivery for overnight delivery, upon receipt when personally delivered, or upon delivery after acknowledgement of receipt by the receiving party. Any change of address or addresses shall be communicated in the manner described above for giving notices.

78. If for any reason the U.S. Department of Justice ("DOJ") or the District Court should decline to approve this Consent Decree in the form presented, the Parties shall use their best efforts to work together to modify the Consent Decree within thirty (30) calendar days so that it is acceptable to the DOJ or the District Court. If the Parties are unable to modify this Consent Decree in a mutually acceptable manner that is also acceptable to the District Court, this Consent Decree shall immediately be null and void as well as inadmissible as a settlement communication under Federal Rule of Evidence 408 and California Evidence Code section 1152.

The Settling Parties hereto enter into this Consent Decree and submit it to the Court for its approval and entry of final judgment.

IN WITNESS WHEREOF, the undersigned have executed this [proposed] Consent Decree as of the date set forth below.

**APPROVED AS TO CONTENT**

LOS ANGELES WATERKEEPER

by: _____
    Bruce Reznik
    Executive Director

Date: _____, 2021

KRAMER METALS, INC.

by: _____
    Stanley Kramer
    CEO

Date: _____, 2021

**APPROVED AS TO FORM**

SYCAMORE LAW, INC.

by: _____
    Jesse Swanhuyser
    Attorney for Plaintiff

Date: _____, 2021

CASTELLÓN & FUNDERBURK LLP

by: _____
    Ruben Castellón
    Attorney for Defendant

Date: ___May 12___, 2021

**IT IS SO ORDERED:**

Date: JULY 7, 2021

    Consuelo B. Marshall
    HON. CONSUELO B. MARSHALL
    UNITED STATES DISTRICT JUDGE

The Settling Parties hereto enter into this Consent Decree and submit it to the Court for its approval and entry of final judgment.

IN WITNESS WHEREOF, the undersigned have executed this [proposed] Consent Decree as of the date set forth below.

**APPROVED AS TO CONTENT**

LOS ANGELES WATERKEEPER

by: _____
    Bruce Reznik
    Executive Director

Date: _____, 2021

KRAMER METALS, INC.

by: _____
    Stanley Kramer
    CEO

Date: _05-12_____, 2021

**APPROVED AS TO FORM**

SYCAMORE LAW, INC.

by: _____
    Jesse Swanhuyser
    Attorney for Plaintiff

Date: _____, 2021

CASTELLÓN & FUNDERBURK LLP

by: _____
    Ruben Castellón
    Attorney for Defendant

Date: _____, 2021

**IT IS SO ORDERED:**

Date: _____

_____
Consuelo B. Marshall
DISTRICT COURT JUDGE
CENTRAL DISTRICT OF CALIFORNIA

The Settling Parties hereto enter into this Consent Decree and submit it to the Court for its approval and entry of final judgment.

IN WITNESS WHEREOF, the undersigned have executed this [proposed] Consent Decree as of the date set forth below.

**APPROVED AS TO CONTENT**

LOS ANGELES WATERKEEPER

by: _____
    **Bruce Reznik**
    **Executive Director**

Date: __5/13__, 2021

KRAMER METALS, INC.

by: _____
    **Stanley Kramer**
    **CEO**

Date: _____, 2021

**APPROVED AS TO FORM**

SYCAMORE LAW, INC.

by: _____
    **Jesse Swanhuyser**
    **Attorney for Plaintiff**

Date: __MAY 12__, 2021

CASTELLÓN & FUNDERBURK LLP

by: _____
    **Ruben Castellón**
    **Attorney for Defendant**

Date: _____, 2021

**IT IS SO ORDERED:**

Date: _____

_____
**Consuelo B. Marshall**
**DISTRICT COURT JUDGE**
**CENTRAL DISTRICT OF CALIFORNIA**